UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NATHANIEL R. BRAZILL,

    Plaintiff,

v.    Case No. 8:14-cv-3131-T-27JSS

JOHN MINERS, et al.,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** is Defendants' Flores, Johnson, Miners, Price, Serles and Zeigler's, Corrected Motion for Final Summary Judgment (Dkt. 122), which Plaintiff opposes (Dkt. 125). The Motion for Summary Judgment is **GRANTED**.

### I. INTRODUCTION AND BACKGROUND

Plaintiff, a Florida prisoner, filed a Second Amended Complaint (Dkt. 45) alleging that the Defendants violated his constitutional right to bodily privacy. Specifically, he alleged that Defendants (except Serles) either implemented, adopted, or enforced a policy at Hardee Correctional Institution (HCI) requiring cell doors to be locked open between 4:30 a.m. and 10:00 p.m. As a result, staff and other prisoners could observe Plaintiff's buttocks and genitalia while he used the toilet in his cell. On several occasions, he saw female officers looking at his genitalia while he was using the toilet. Plaintiff alleged that Defendants Johnson and Serles violated his First Amendment rights when they retaliated against him for filing grievances regarding the invasion of privacy by transferring him to an "open bay dorm." In his complaint, he requested declaratory relief and monetary damages.

Plaintiff's request for declaratory relief and compensatory and punitive damages were

dismissed (see Dkts. 49, 69). His request for nominal damages for violation of his right to bodily privacy claim and retaliation claim was allowed to proceed (Id.).

Defendants argue that they are entitled to summary judgment on these claims because: 1) there is no evidence that Defendants Johnson and Serles retaliated against Plaintiff for filing grievances; 2) Plaintiff's privacy rights were not violated; and 3) they are entitled to qualified immunity. Plaintiff concedes that Defendant Serles is entitled to summary judgment on his retaliation claim. He disagrees, however, that Defendant Johnson is entitled to summary judgment on that claim, and that Defendants are entitled to summary judgment on his invasion of privacy claims.

## II. FACTUAL BACKGROUND

Plaintiff was, at all times relevant to the Second Amended Complaint, incarcerated at HCI. When he arrived at HCI in 2010, he was assigned to a two-man cell in E-dorm that had a door which swung open (Dkt. 125-1, p. 1). The cell door had a plexiglass window, and the toilet in the cell was located approximately two feet from the door (Id.). Because at that time cell doors were never locked in the open position, Plaintiff would close the door when he used the toilet (Id., pp. 1-2). When the door was closed, Plaintiff's buttocks and genitalia were "shielded" from the view of other prisoners and female officers while he used the toilet (Id., p. 2). However, if someone stood at the closed door and looked through the window, that person could observe Plaintiff's buttocks or genitalia while he was using the toilet (Dkt. 122-4, pp. 167, 169).

In 2012, Randy Tifft, Regional Director of Region III (which includes HCI) for the Florida Department of Corrections, ordered "Region III institutions to lock the [cell] doors open or lock them closed" during the day (Dkt. 122-2, pp. 1-2). Most institutions chose to lock cell doors open "because locking them closed resulted in the need for additional staff to open and close the doors during the

day as inmates entered and left their cells." (Id., p. 1). Leaving cell doors open but unlocked creates a security risk, since inmates may pull another inmate or staff into a cell, lock the door, and assault that person (Id., p. 2). Moreover, a cell door that is locked closed makes it more difficult for staff to see the assault in the cell and assist the victim (Id.). Additionally, a cell door that is locked closed makes it more difficult for staff to observe other illegal activities in the cell, such as making and hiding weapons, drug use, tattooing, and using cell phones (Id., pp. 2-3). Locking cell doors open was "not a new practice." (Id., p. 1). Tifft worked at many institutions where the cell doors were locked open, including at HCI during the 1990s (Id., pp. 1-2). And Plaintiff's current institution of incarceration, Charlotte Correctional Institution, locks cell doors open (Dkt. 122-4, p. 81).

The wardens and staff at the Region III institutions were required to follow Tifft's order to either lock cell doors open or closed (Dkt. 122-2, p. 3). Failure to obey the order "would have been insubordination, a disciplinary offense, which could result in termination." (Id.).

On May 9, 2012, Colonel J. Miller issued a memorandum to the inmate population at HCI which stated, in pertinent part, that:

> Slider Doors in the Open Population Butterfly Dorms (B, C, D, E, F & G) will be secured in the open position at 8:00am each day. The cell doors will remain in the open secure position until the conclusion of the evening meal. At that time the doors will be released.

(Dkt. 122-5, docket p. 6). On July 25, 2013, a memorandum from Colonel John Miners, HCI's chief of security, was posted in all the HCI dorms (Dkt. 125-1, docket pp. 4, 17). The memorandum stated that slider cell doors in B, C, D, & G dorms would be "secured in the open position" between 5:30 a.m. and 10 p.m., except during formal counts, and that swing cell doors would be "left in the open position" during those times, except during formal counts (Dkt. 125-1, docket p. 17). Despite the

3

memorandum, no officer in E-dorm made inmates keep their cell doors open (Dkt. 125-1, docket p. 4).

On June 20, 2014, Plaintiff was moved from E-dorm to B-dorm, which has two-man cells with either "swing" doors or "slider" doors (Id.). Plaintiff's cell had a slider door (Id.). In B-dorm, "the locked open cell door policy for slider doors was religiously enforced." (Id.). Only slider cell doors in B-dorm were locked open (Id.), since swinging doors cannot be locked open (Dkt. 122-4, pp. 75, 143). While Plaintiff was housed in B-dorm, there were no "privacy screens" available to use while inmates were using the toilet in their cells (Dkt. 125-1, docket p. 4).[1] On September 15, 2014, Johnson received an e-mail from Tifft directing institutions to provide privacy screens no later than October 31, 2014 (Dkts. 122-2, docket p. 18; 122-3, p. 3), and the screens became available at HCI on that date (Dkt. 122-3, pp. 3-4). Plaintiff has never used a privacy screen (Dkt. 122-4, p. 248), and even if he had, someone could still look into his cell and see him on the toilet (Id., pp. 249-50).

Inmates were prohibited from hanging items, such as sheets or blankets, from the cell doors or ceilings to prevent others from seeing inside their cells (Dkt. 122-3, p. 3). They were authorized, however, to cover themselves with blankets, sheets, towels, pillow cases, or clothes while using the toilet in their cell, and they could turn their backs to the cell door while using the toilet (Id., p. 4; Dkt. 125-1, docket p. 28). At any given time, inmates have four white t-shirts, four pairs of boxer shorts, six socks, three blue shirts, three pairs of pants, one towel, one washcloth, two sheets, one blanket, one pillowcase, a mattress, and a pillow in their cells (Dkt. 122-3, pp. 171-72).

Female officers routinely worked in B-dorm (Dkt. 122-4, p. 162; Dkt. 125-1, docket p. 25).

---

[1] Privacy screens are made of PVC and sheets or blankets, are the width of the open cell door and approximately 41 inches high, and may be used by inmates when using the toilet in their cell (Dkt. 122-3, p. 4; Dkt. 122-2, docket p. 19).

4

Plaintiff estimates that female officers locked open cell doors in B-dorm approximately 20 percent of the time (Dkt. 122-4, p. 162). On June 24, July 13, July 24, August 17, August 24, September 18, September 27, and October 2, 2014, while Plaintiff's cell door was locked open, female officers looked at his genitals while he was either standing and urinating or sitting and defecating in the toilet in his cell (Dkt. 125-1, pp. 3-7). Although the female officers themselves did not announce their presence when entering B-dorm (id.), an announcement over the intercom system was made to the inmates on each of those days indicating that female officers may be in B-dorm during the shift (Dkt. 122-5, docket pp. 3, 11-19).[2]

While in B-dorm, Plaintiff never attempted to place a towel, blanket, sheet, shirt, etc., over his lap to cover his genitals when using the toilet in his cell, and never saw other inmates cover themselves in that manner (Dkt. 122-4, pp. 172-74). He asserts that "[i]t was not possible for [him] to shield [himself] with a blanket or sheet while [urinating because he] was physically unable to do that[, and]. . .[w]hen [he] defecated in the toilet. . .[he] could not use a blanket or sheet to cover [himself] because policy required that [his] bunk be made with the sheet and blanket. . . ." (Dkt. 125-1, p. 8). He also attests that on November 18, 2017, he "did an experiment to see if a towel over [his] lap would actually provide privacy protection when using the toilet." (Id., p. 10). He noticed that his "buttock was still exposed[,]. . .it was not possible for [him] to clean [his] anus without first removing the towel[,]. . .[and] when [he] attempted to rise from the toilet, [he] found that [he] could not cover [his] genitals and buttocks with towel white [sic] simultaneously pulling up [his]

---

[2]Plaintiff does not allege that he: (1) did not hear those announcements; and (2) did not know that female officers were in B-dorm on those days (Dkt. 125-1). Although he states that on August 24, 2014,"[t]here was no announcement or warning from Ms. Murphy or anyone else that she was walking around" (Dkt. 125-1), that statement does not refute the evidence indicating that an announcement was made that female officers may be in B-dorm during that shift.

5

underwear and pants." (Id.).

On September 16, 2014, Plaintiff filed an informal grievance complaining that the policy requiring cell doors to be locked open violated his privacy rights, since female staff can see his "genitalia and anus" while he uses the toilet (Dkt. 122-7, docket p. 3). The grievance was denied and Plaintiff was informed, in pertinent part, that cell doors are locked open for the safety of staff and inmates, announcements are made when female officers are in the dorms, he can use a towel or blanket to cover himself while using the toilet, and for the majority of the day inmates are not in the dorms (Id.). On September 23, 2014, he filed a formal grievance with the warden at HCI, which was denied (Id., docket pp. 1-20). On October 6, 2014, Plaintiff filed an appeal grievance to the Secretary for the Department of Corrections, which was denied on October 10, 2014 (Dkt. 125-1, p. 9). On October 15, 2014, a copy of the denial was mailed to both Plaintiff and Defendant Johnson (Id.).

On October 20, 2014, Plaintiff and three other inmates were moved from C-dorm (Dkt. 125-1, p. 9).[3] The three other inmates were moved to another "two man cell dorm[,]" and Plaintiff was moved to H-dorm, which was an "open bay dorm." (Id.). The open bay dorm, in Plaintiff's opinion, "was the least desirable housing unit" at HCI, since: (1) he could not turn off the lights when he went to sleep, as the lights were controlled by staff in the officer's station; (2) there was "disruptively loud noise from multiple inmates constantly talking around him in the open area sleeping quarters;" (3) the heating system was much less efficient than the individual heaters in the two man cells; and (4) the sinks and toilets were "foul smelling" and "disgusting" because they were shared by 72 inmates (Id.). Despite Plaintiff's dissatisfaction with the open bay dorm, he concedes that other inmates have

---

[3]Plaintiff was moved from B-dorm to C-dorm (another two-man cell dorm) on October 2, 2014 (Dkt. 45, p. 31).

6

told him that they prefer an open bay dorm, since they can go to the shower whenever they like and are not locked behind a door (Dkt. 122-4, pp. 200-01). He admits that whether an inmate prefers an open bay dorm or a dorm with cells is a matter of personal preference (Id., p. 201).

When Plaintiff was moved to the open bay dorm on October 20, 2014, neither Johnson nor Serles knew which type of dorm Plaintiff preferred (Dkt. 122-3, p. 5; Dkt. 122-8, p. 2). Johnson did not order anyone to change Plaintiff's housing assignment, and he does not know the reason Plaintiff was moved (Dkt. 122-3, pp. 5-6). Serles was not ordered by Johnson to move Plaintiff, and she had no involvement in Plaintiff's reassignment to H-dorm on October 20, 2014 (Dkt. 122-8, p. 2). Records from HCI indicate that Rebecca L. Holt was the control room supervisor who moved Plaintiff from C-dorm to H-dorm (Id., pp. 1-2; Dkt. 122-3, docket pp. 7-9). Housing assignment decisions are based on institutional or medical needs, not on inmate preferences (Dkt. 122-3, pp. 5-6). Plaintiff has no documentation or information from others supporting his allegation that Johnson and Serles transferred him to H-dorm in retaliation for filing grievances regarding the policy requiring cell doors be locked open (Dkt. 122-4, pp. 189-90).

### III. APPLICABLE STANDARD OF REVIEW

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56©. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the

evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. The evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the nonmoving party. *Id.*

## IV. DISCUSSION

### 1. Defendant Serles

Plaintiff concedes that Defendant Serles is entitled to summary judgment (Dkt. 125-1, p. 24). Accordingly, summary judgment will be granted in her favor.

### 2. Defendants are Entitled to Qualified Immunity with Regard to Plaintiff's Right to Privacy Claim

Plaintiff contends that "Defendants Miners, Johnson, Flores, Zeigler, and Price violated [his] constitutional right to bodily privacy by failing to provide privacy screens after creating, implementing, and maintaining a prison policy requiring cell doors be locked in the open position

8

which, while defecating and urinating, resulted in the involuntary exposure of [his] private parts to (a) officers of the opposite sex and (b) other inmates. . . ." (Dkt. 125, p. 2). Defendants argue that they are entitled to qualified immunity with regard to this claim (Dkt. 122, pp. 20-24).

Qualified immunity is a question of law, even when asserted on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

> The objective nature of qualified immunity defines what fact issues are material for summary judgment purposes. To avoid summary judgment it is not enough for a plaintiff to produce evidence, which—if believed (for summary judgment its truth is assumed)—would allow a fact-finder to find just that the government-agent defendant was, in reality, wrong about the facts on which the defendant acted. Instead, to defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a fact-finder to find that no reasonable person in defendant's position could have thought the facts were such that they justified defendant's acts.

*Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993) (citing *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1234-35 (11th Cir. 1992)).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As such, qualified immunity allows officials to "carry out their discretionary duties without fear of personal liability or harassing litigation[.]" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir.2002) (internal citations omitted). "[O]nly in exceptional circumstances will government actors have no shield against claims made against them in their individual capacities." *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (citations and emphasis omitted). Because qualified immunity is "immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), its purposes would be

9

"thwarted if a case is erroneously permitted to go to trial." *Baltimore v. City of Albany, Georgia*, 183 Fed. App'x 891, 895 (11th Cir.2006) (citations and quotations omitted).

To qualify for qualified immunity, the public officials must first establish that they were acting within the scope of their discretionary authority. *Ferraro*, 284 F.3d at 1194. Once that showing is made, the burden shifts to the plaintiff to show that qualified immunity should not apply. *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir.2009). First, a plaintiff must show that, considered in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional right was violated, the defendant is entitled to qualified immunity. If the facts establish a constitutional violation, a plaintiff must then show that, at the time the incident occurred, "every reasonable [] officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens-Clarke Co.*, 378 F.3d 1274, 1278-79 (11th Cir.2004) (citing *Saucier*, 544 U.S. at 201-02).

### a. Whether Defendants were Acting Within the Scope of Their Discretionary Authority

There is no dispute that Defendants were acting within the scope of their discretionary authority in enforcing the policy requiring cell doors to be locked in the open position. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (a government employee is acting within the scope of discretionary authority when the acts in question "are of a type that fell within the employee's job responsibilities.").

### b. Whether Defendants Violated Plaintiff's Constitutional Rights

Prisoners have a constitutional right to bodily privacy. *Fortner v. Thomas*, 983 F.2d 1024, 1026 (11th Cir. 1993). In *Fortner*, "female officers ... solicit[ed] ... [male prisoners] to masturbate

and otherwise exhibit their genitals for the female officers' viewing." *Id.* at 1027. *Fortner* outlined a privacy right involving persons' "special sense of privacy in their genitals and noted that involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." *Id.* (citations and internal quotations omitted). The Eleventh Circuit has further stated that "absent a legitimate reason, individuals maintain a right to bodily privacy, in particular the right not to have their genitals exposed to onlookers." *Mitchell v. Stewart*, 608 F. App'x 730, 735 (11th Cir. 2015).

Plaintiff asserts that on multiple occasions his genitals were exposed to female officers and other prisoners due to the prison policy at HCI requiring cell doors to be locked in the open position. "When a prison regulation or policy 'impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" *Fortner*, 983 F.2d at 1030 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). *Turner* outlines four factors to be considered in evaluating the constitutionality of prison regulations: (1) whether the regulation bears a rational connection to the legitimate governmental interest put forth to justify it; (2) whether there are available other alternative means of exercising the asserted rights; (3) the impact of accommodating the asserted right on the interest of inmates, prison personnel, and prison resources generally; and (4) whether there is an absence of ready alternatives. *Id.*, 482 U.S. at 89-90. Additionally, courts must accord prison officials with "'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Powell v. Barrett*, 541 F.3d 1298, 1311 (11th Cir. 2008) (quoting *Bell v. Wolfish*, 441 U.S. 520, 527 (1979)).

There is a rational connection between the policy requiring cell doors to be locked open and

HCI's interest in security and efficiency. And there were alternative means for Plaintiff to protect his privacy while using the toilet in his cell - - he could sit on the toilet and place a blanket, sheet, or towel over his lap to cover himself. Plaintiff cannot defeat summary judgment by relying on his self-serving allegation that when he recently attempted to cover himself with a towel while using the toilet, his buttock was still exposed, and he had to remove the towel to wipe himself (Dkt. 125-1, docket p. 12). *See Ralston Purina Co. v. Hobson*, 554 F.2d 725, 728-29 (5th Cir. 1977) ("[C]ompletely self-serving testimony, unsupported by other evidence and in the teeth of universal experience, will not support a jury verdict."); *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient") (quotations and citation omitted)). Moreover, he never attempted to cover himself with a blanket or sheet.

Although he asserts that he could not cover himself with a blanket or sheet, since "policy required that my bunk be made with the sheet and blanket tucked in all the way around the mattress. . . ." (Dkt. 125-1, docket p. 10), he was granted permission to use a blanket to cover himself (Dkt. 122-7, p. 3), and he presents no evidence that he or any other prisoner was disciplined for using a blanket or sheet to cover himself while using the toilet. And he cannot defeat summary judgment by relying on his allegation that he could not cover his genitals and buttocks when he stood up from the toilet and pulled up his pants (Dkt. 125-1, docket p. 12), since he does not allege that another prisoner or officer saw his genitals or buttocks while pulling up his pants (see Dkt. 125-1). And even if that had occurred, it would not amount to a constitutional violation, since the exposure would have been extremely limited and for a very brief time. *See, e.g., Michenfelder v. Sumner*, 860 F.2d 328,

12

334 (9th Cir. 1988) ("assigned positions of female guards that require only infrequent and casual observation, or observation at distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference."); *Malo v. Hernandez*, 2014 U.S. Dist. LEXIS 175512, at *22 (C.D. Cal. Nov. 5, 2014) ("cross-gender momentary or far-off observation of a strip search by prison personnel does not violate the Constitution.").

Accommodating Plaintiff by leaving cell doors open and unlocked would affect the security of staff and prisoners, since prisoners may pull other prisoners and staff into a cell, close and lock/jam the door, and commit an assault (Dkt. 122-2, p. 2). And locking cell doors closed would affect prison resources, since it would require additional staff to open and close the doors during the day as prisoners entered and left their cells, or place additional burdens on existing staff to do so (Dkt. 122-3, p. 2). Finally, there is no genuine dispute about whether there are obvious, available alternatives to HCI's policy to locking cell doors open, since any remedy would increase administrative burdens and compromise security.

Plaintiff has failed to establish a constitutional violation with respect to his right to privacy claim. Accordingly, Defendants are entitled to qualified immunity.

### 3. Defendant Johnson is Entitled to Summary Judgment on Plaintiff's Retaliation Claim

Plaintiff alleges that Johnson violated his First Amendment rights by retaliating against him for filing grievances regarding the policy requiring cell doors to be locked open. He contends that Johnson retaliated against him by having him moved from a dorm with cells to an "open bay" dorm.

"It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement…It is also established that an inmate may

13

maintain a cause of action against prison administrators who retaliate against him for making such complaints...To prevail, the inmate must establish these elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) (citations omitted).

With regard to the first element, whether Plaintiff's speech was constitutionally protected, he has demonstrated that he filed grievances regarding the "open door" policy. He therefore has established that his speech was constitutionally protected. *See Smith v. Mosley*, 532 F.3d at 1277 (filing of prison grievances amounts to protected speech).

With regard to the second element, Plaintiff has failed to show that he suffered adverse action, such that the allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech. *See Mosley*, 532 F.3d at 1276. It is undisputed that many prisoners prefer the open bay dorms over dorms with two-man cells, and the parties agree that it is a matter of personal preference. And Plaintiff presents no evidence that at the time he was transferred to H-dorm, Johnson knew that he preferred a two-man cell over an open bay dorm.[4] He does not even allege that before he was moved he had an opinion that open bay dorms were less desirable. A transfer to a similarly desirable dorm is not an adverse action. *See, e.g., Reynolds-Bey v. Harris-Spicer*, 428 F. App'x 493, 503 (6th Cir. 2011) ("routine inconveniences of prison life. . .do

---

[4]To the extent Plaintiff implicitly argues that his constitutional rights were violated when Johnson failed to move him back to a dorm with two man cells after he filed a grievance claiming he was moved to an open bay dorm in retaliation for filing grievances (see Dkt. 125, p. 23; Dkt. 125-1, docket p. 14), he has no right to a particular housing assignment. *See McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); *Williams v. Faulkner*, 837 F.2d 304, 309 (7th Cir. 1988) ("Prisoners have no constitutionally protected liberty interest in remaining in any particular wing of a prison.").

not constitute adverse action.") (citations omitted); *Jefferson v. Pepin*, 2017 U.S. Dist. LEXIS 186465, at *13-14 (D.R.I. Jan. 26, 2017) ("Plaintiff has failed to establish that he suffered an adverse action by being moved into a cell in a cellblock he deems less desirable."); *Simpson v. Superintendent, Merrimack Cty. Dep't of Corr.*, 2014 U.S. Dist. LEXIS 49785, at *5 (D.N.H April 10, 2014) (in the prison context "[a] transfer to *a more restrictive or less desirable* environment can be an adverse action.") (emphasis added); *Fox v. Vickers*, 2014 U.S. Dist. LEXIS 24452, at *14 (W.D. Ark. Jan. 23, 2014) ("Adverse actions may include a denial of privileges, acts worsening an inmate's working conditions, internal transfers to *less desirable* units, and transfer between prisons.") (emphasis added).

Viewing the facts in the light most favorable to Plaintiff, no jury could reasonably conclude that his transfer to the open bay dorm was sufficient adverse action that would likely deter a person of ordinary firmness from engaging in protected speech. Accordingly, Johnson is entitled to summary judgment with respect to Plaintiff's retaliation claim.

Defendants' corrected motion for summary judgment (Dkt. 122) is therefore **GRANTED**. Defendants' motion for summary judgment (Dkt. 121), and Plaintiff's Unopposed Petition for Writ of Habeas Corpus Ad Testificandum (Dkt. 126) are **DENIED** as moot. The **Clerk** is directed to enter judgment in favor of Defendants and close this case.

**DONE AND ORDERED** on this 28th day of December, 2017.

JAMES D. WHITTEMORE
United States District Judge

Copies to: *Pro se* Plaintiff; Counsel of Record

15